**Opinion issued April 2, 2020**



In The

# Court of Appeals

### For The

# First District of Texas

_____

### NO. 01-19-00884-CV

_____

## IN THE INTEREST OF J.L.K., J.H.K., T.C.C., AND J.B.K., Children

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-04819J**

## MEMORANDUM OPINION

The trial court terminated the parental rights of appellant, A.D.C. (Arial), to

her four children, J.L.K. (Jeff), J.H.K. (Jane), T.C.C. (Tyesha), and J.B.K. (Janet).[1]

---

[1]   We refer to the children and their family members by the pseudonyms used in the parties' briefing for clarity and to protect the identity of the children.

In her sole issue on appeal, Arial argues that the evidence was factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest. We find the evidence was sufficient, and we affirm.

## Background

Arial is the mother of Jeff, born in 2012, Jane, born in 2014, Tayesha, born in 2016, and Janet, born in 2018. Arial had a romantic relationship with Q.O.K. (Quick),[2] and he is the father of two of the children, Jane and Janet. The Texas Department of Family and Protective Services (DFPS) was unable to identify the biological fathers of Jeff and Tayesha.

Case worker Deshondra Johnson testified that Jeff, Jane, Tayesha, and Janet were ages seven, five, three, and eighteen months, respectively, at the time of trial. She testified that DFPS had been involved with Arial and her children for over five years at the time of trial. The record reflects that, in approximately 2014, Arial's involvement with DFPS resulted in Jeff (then aged two) and Jane (then an infant) being removed from Arial and placed with their paternal grandmother, "Ms. Nana."

The underlying case began in 2018, when DFPS received two referrals—one in May and another in July—against Arial and Quick for neglectful supervision of

---

[2]     Quick, who was established by paternity testing to be the father of Jane and Janet, had his parental rights to those two children terminated. He is not a party to this appeal.

Tayesha and Janet. On petitioning to remove Tayesha and Janet from Arial's care, DFPS noted that Jeff and Jane had been living with Ms. Nana for several years and sought to place the two younger children with Ms. Nana as well. DFPS alleged that, in addition to neglectful supervision and concerns that Arial lacked stable housing for herself and her children, both Tayesha and Janet had tested positive for tetrahydrocannabinol (THC) at birth and that Arial had a history of engaging in domestic violence, including engaging in domestic violence around the children.

As of October 2018, all four children began living with Ms. Nana. DFPS provided Arial with a family plan of service, which required, among other items, that she maintain employment and stable housing, complete psychological, substance abuse, and domestic violence assessments and follow any recommendations, and complete parenting classes. However, Arial failed to complete the plan, and she also had several positive drug tests.

In October 2019, the trial court held the final termination hearing. DFPS presented evidence of Arial's criminal background. This included a 2015 offense of family violence against Quick, in which Arial was granted deferred adjudication. DFPS presented evidence, however, that the State had moved to proceed with adjudication of this offense, asserting that Arial had violated several terms of her deferred adjudication community supervision in connection with that case, including that she had failed to report to her supervision officer and for a

3

required administrative hearing, to pay required fines, to complete her community service restitution, to comply with the court's order that she have no contact with Quick, the victim, and to attend the required anger management and batterer's intervention program. Arial had also pleaded guilty in 2018 to the felony offense of cruelty to a non-livestock animal based on her killing Quick's dog, and she was on probation for that offense.

In addition to this documentation reflecting Arial's criminal history, Johnson testified that, at the time of trial, there was an open warrant for Arial's arrest based on her violation of the deferred adjudication community supervision terms of the 2015 charge for assaulting Quick. Johnson stated that Arial would be arrested at the conclusion of the trial, and Johnson was concerned that the arrest also indicated that she had violated the terms of her probation in the 2018 felony charge for killing Quick's dog.

DFPS also presented evidence of Arial's drug test results taken during the pendency of the case. In addition to providing laboratory results, Johnson also testified that Arial did not fully comply with DFPS's random drug testing. Johnson testified that the results of Arial's drug tests in October 2018, December 2018, March 2019, and July 2019 all showed the presence of controlled substances in her system. In October 2018 she tested positive for cocaine, cocaine metabolites, and marijuana. In December 2018, she tested positive for cocaine and marijuana. In

March 2019, she testified positive for marijuana. Johnson also testified that Arial's hair follicle drug test was positive for cocaine and marijuana in July 2019. Johnson acknowledged that Arial's drug tests had generally shown a decreasing use of drugs until July 2019, when the level went "way back up." Arial's September 2019 drug test was negative.

Regarding services, Johnson testified that Arial had not completed the recommendations based on her domestic violence assessment, which included requirements that she take anger management and domestic violence education. She had not completed her outpatient substance abuse treatment or the recommendations following from her psychological assessment.

Arial had completed some portion of her family service plan. Johnson testified that Arial's provider had notified DFPS that Arial had participated in individual counseling and substance abuse counseling, but at the time of trial, Johnson had not been provided with any proof that Arial had been successfully discharged from those programs. Johnson also acknowledged that Arial had presented paperwork on the day of trial demonstrating that she had completed two of eight required parenting classes. Johnson testified that, following her domestic violence assessment, the provider had recommended that Arial complete a 45-day intensive outpatient treatment with three group sessions and one individual session per week. Johnson had not yet found a place for Arial to complete that treatment.

During the year this case was pending, Arial attended one visitation with her children, despite the fact that DFPS would have allowed more visitations. Johnson testified that she scheduled a visitation that Arial missed, and Arial told her "that she didn't want to do visitation because she liked to have toys and things for her children. And then after that, she said [she could not do visitation] because of her stress. She had high blood pressure, so she wasn't able to do it." Johnson believed that Arial had attended Jeff's birthday party, but she did not believe that Arial had engaged in any further visitation with the children, nor had she demonstrated a desire to care for the children on a daily basis.

Johnson testified that Arial had been staying in an apartment since November 2018 and that Johnson had been able to visit the apartment. Johnson testified that Arial had just provided her a copy of the lease right before trial, and the lease was set to expire the following month in November 2019. Johnson testified that, despite the fact that Arial had made some efforts to comply with the family service plan, she believed Arial's drug use, especially her drug use while pregnant with Tayesha and Janet, her criminal activity, and her failure to follow the family service plan endangered the physical or emotional well-being of the children. Johnson believed that termination of Arial's parental rights was in the children's best interest, and she testified that it was in the children's best interest to allow Ms. Nana to adopt them.

Arial also testified at trial. She stated that she had started all of her required classes at one point but stopped doing them because she got sick, stating, "I got sick with my blood pressure where I couldn't go to work and I couldn't do nothing. So, like, I stopped doing everything. But then when I started feeling better, I started going to all my stuff and I started working again. There's nothing I can help that I got sick." Arial testified that she had been living in the apartment since November 2018. Arial also testified that she had worked "throughout this entire case," first at McDonalds and, at the time of trial, at "Labor Ready."

Regarding the substance abuse allegations, Arial testified that she had not used marijuana since July 2018, and she testified that she had "never used cocaine." Arial admitted that she had an open warrant for her arrest for a violation of probation and that the underlying offense was assault of family member, which she got for "fighting [Quick]." Arial also acknowledged that she was on probation for "killing a dog for fighting with [Quick]."

Arial also testified about her visitation and involvement with the children. When asked if she had been visiting the children, she answered, "I talk to them. I visit. I seen him for his birthday." Arial clarified that when she testified that she talked to the children, she did that by having a video chat or phone call with Ms. Nana. She acknowledged that she had visited the children "a very few times over a year."

Finally, DFPS presented evidence of its plans for the children. All of the children were placed with Quick's mother, Ms. Nana, and she intended to adopt them. Jeff and Jane had been living with Ms. Nana for the last five years, with Johnson testifying that Ms. Nana "basically raised [them] their entire lives, or most of their lives." Ms. Nana had also been caring for Tayesha and Janet for the year leading up to the final termination hearing. Johnson testified that the children were doing well with Ms. Nana, that she was meeting all their needs, and that she was willing to keep them and raise them until adulthood "and even past." Johnson stated that DFPS did not have any concerns regarding Ms. Nana as a caregiver for the children. Johnson further testified that she believed Ms. Nana would be "protective from the parents and do whatever is necessary to keep these kids happy and healthy." Ms. Nana also testified that she intended to adopt all four children in order to provide them stability, love, and "everything else that goes with parenting."

The trial court made numerous findings that Arial's conduct satisfied the statutorily enumerated predicate findings for termination under Family Code section 161.001(b)(1), including that she had knowingly placed or knowingly allowed the children to remain in endangering conditions under subsection (D); that she had engaged in endangering conduct or knowingly placed the children with persons who engaged in endangering conduct under subsection (E), and that

8

she had failed to comply with the provisions of her court-ordered family service plan under (O). The trial court further found that termination of Arial's parental rights to all four children was in their best interests pursuant to Family Code section 161.001(b)(2), and it terminated Arial's parental rights. This appeal followed.

## Factual Sufficiency of Best Interest Finding

In her sole issue on appeal, Arial asserts that the evidence was factually insufficient to support the trial court's finding that terminating her parental rights to all four children was in their best interests.

### A. Standard of Review

A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination and that termination of parental rights is in the best interest of the children. TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (stating that federal due process clause and Texas Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). DFPS must prove both elements—a statutorily prescribed predicate finding and that termination is in the children's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 803. The Family Code defines "clear and convincing evidence" as "the

measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

When a parent challenges the factual sufficiency of the evidence supporting the trial court's findings, we review all the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We should inquire whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In applying this standard, our review "must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)); *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that we must still provide due deference to decisions of factfinder, which had full opportunity to observe witness testimony and was sole arbiter of assessing witness credibility and demeanor).

## B. Factors Relevant to Best-Interest Determination

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a). There is a strong, but rebuttable, presumption that the best interest of a child is served by keeping the child with a parent. TEX. FAM. CODE § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *Jordan v. Dossey*, 325 S.W.3d 700, 729 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (noting that parent-child relationship has constitutional underpinnings, but courts must not sacrifice child's emotional and physical interests "merely to preserve that right").

The Texas Legislature has set out several factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude and frequency of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by DFPS; (5) whether there is a history of abusive or assaultive conduct or substance abuse by the child's family or others who have access to the child's home; (6) the willingness of the child's family to seek out, accept, and complete counseling services; (7) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (8) whether the child's family

11

demonstrates adequate parenting skills, including providing minimally adequate care for the child's health and nutritional need, care consistent with the child's physical and psychological development, guidance and supervision consistent with the child's safety, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b).

The Texas Supreme Court has also set out several non-exclusive factors that we should consider when determining whether the termination of a parent's rights is in the child's best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person seeking custody; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.). These factors are not exhaustive, and it is not necessary that DFPS prove all of these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d at 27. The absence of evidence concerning some of the

12

factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d at 642.

Proof concerning the statutory predicate findings under section 161.001(b)(1) does not relieve DFPS of its burden of proving that termination is in the children's best interest, but "the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28. The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*; *see In re C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis).

## C. Analysis

Multiple factors support the trial court's finding that termination of Arial's parental rights to her four children was in the children's best interests.

The children's ages, physical and mental vulnerabilities, and future needs weigh in favor of termination. At the time of trial, Jeff was seven, Jane was five, Tayesha was three, and Janet was approximately eighteen months, and there was no indication in the record regarding their desires. "When children are too young to

express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). DFPS presented evidence that the children were well-cared for by Ms. Nana, who had had custody of Jeff and Jane for approximately five years and of Tayesha and Janet for approximately one year at the time of trial.

Arial argues that the children were also bonded to her as their mother. The record, however, does not contain significant evidence to support her argument. DFPS presented evidence that Arial had had minimal involvement with the children while this case was pending. Johnson testified that Arial attended one visit set up by DFPS, and Johnson and Arial both testified that Arial attended a birthday party for Jeff. Furthermore, the children's young ages render them vulnerable if left in the custody of a parent unable or unwilling to protect them or to attend to their needs. *See* TEX. FAM. CODE § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72; *see also In re B.D.A.*, 546 S.W.3d 346, 361 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding same when children were seven, five, and four at time of trial).

Next, we conclude that danger to the children in the past, and evidence supporting an inference of probably future danger, weighs in favor of the trial

14

court's best-interest finding. DFPS presented evidence that the children were removed due to Arial's drug use and history of domestic violence. Arial had assaulted Quick, the father of two of the children, in 2015, and Arial had killed Quick's dog in 2018. The evidence further indicated that Arial had not complied with the terms of her probation in the assault case, had an open warrant for her arrest at the time of trial, and would be arrested at the conclusion of the trial. *See In re T.G.R.–M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (noting that, each time parent was jailed, parent was absent from child's life and unable to provide for child's physical and emotional needs).

The evidence also demonstrated that Arial's history of drug use endangered the children. Both Tayesha and Janet were born with THC in their systems. After the children were removed from her care, Arial continued to have repeated positive drug tests during the year the case was pending. *See In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's continued drug use when custody of her children is in jeopardy supports finding of endangerment). Despite her two younger children being born testing positive for THC and her drug tests showing positive results for cocaine, cocaine metabolites, and marijuana, Arial denied using marijuana after July 2018, and she denied ever using cocaine. When the record shows the parent's drug abuse, the parent's unwillingness to admit to having a substance-abuse problem suggests that the

15

parent will continue to engage in the same behaviors that endangered the child. *In re L.M.*, 572 S.W.3d 823, 835 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Even considering evidence that, for a period of time her drug use appeared to decrease and that she had a negative drug test in September 2019, the month before trial, we conclude that the evidence supported the conclusions that the children would continue to be in danger due to the instability caused by Arial's drug use and domestic violence and that her relationship with the children was not appropriate. *See* TEX. FAM. CODE § 263.307(b)(8) (providing that history of substance abuse is relevant to determining children's best interest); *In re D.R.A.*, 374 S.W.3d 528, 536 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (considering failed drug test, among other factors, as evidence that parent-child relationship was not appropriate).

The frequency and nature of the children's out-of-home placements, DFPS's plans for them, and Arial's own involvement with the children weighs in favor of the trial court's finding. DFPS presented evidence that Jeff had lived with Ms. Nana for five of his seven years and Jane had lived with Ms. Nana since she was an infant. The two younger children, ages three and eighteen months at the time of trial, had lived with their siblings and Ms. Nana for the year leading up to the trial. The children were happy and doing well with Ms. Nana, who was meeting all their needs and who intended to adopt them so she could provide the stability and care

they needed to support them into adulthood. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (considering, in assessing child's physical and emotional needs, that child was "healthy, happy, and well-adjusted" after approximately eighteen months in care of foster family). Arial argues that Ms. Nana could have continued to be a stable, protective presence in the children's lives, even without terminating Arial's parental rights. However, Texas courts have long held that children's need for a "stable, permanent home" is a paramount consideration in best-interest determinations. *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

Arial testified that she talked to the children and had visited with them. However, the evidence demonstrated that she had participated in minimal visitation with the children and had not demonstrated a desire or ability to care for the children. Although she testified that she had maintained stable employment throughout the pendency of the case, she did not provide any evidence of her income or hours. Arial also testified that she had an apartment, but there was no evidence whether the apartment would accommodate the four children or whether she could continue to live in that apartment when the lease expired in November 2019, one month after trial. There was no evidence that Arial could provide a stable home, that she had adequate parenting skills, or the ability to provide minimally adequate care. *See In re C.A.J.*, 122 S.W.3d 888, 893–94 (Tex. App.—

Fort Worth 2003, no pet.) (stating that courts may consider parent's poor judgment and inability to provide adequate care when determining best interest and that "[w]ithout stability, income, or a home," parent was unable to provide for child's emotional and physical needs). Thus, viewed in light of the entire record, Arial's disputed evidence is not so overwhelming as to weigh against the trial court's finding on this basis.

Furthermore, Arial did not demonstrate a willingness or ability to complete her services or effect positive environmental and personal changes within a reasonable time. *See In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating that, in assessing best interest, courts may appropriately consider whether parent complied with court-ordered family service plan for reunification with child). Although Arial did complete portions of her family service plan, and Johnson testified that DFPS had not found anyone who could provide treatment in accordance with some of the recommendations, there was nevertheless evidence that Arial did not complete the services offered by DFPS. Arial testified generally that she became ill with high blood pressure at one point during the pendency of this case and so could not do anything, but she did not provide any further evidence regarding the duration of her illness or its impact on her ability to comply with her family service plan.

DFPS's evidence that Arial had not completed the recommendations based on her domestic violence assessment, including anger management and domestic violence classes, that she had not completed substance abuse treatment, and that she had not completed all of her parenting classes after a period of one year, supported a conclusion by the trial court that she was not willing or able to address the concerns that had caused the removal of her children in the first place.

Viewing all the evidence, including disputed or conflicting evidence, we conclude that the trial court could have formed a firm belief or conviction that termination of Arial's parental rights was in the children's best interests. *See In re J.O.A.*, 283 S.W.3d at 345; *In re H.R.M.*, 209 S.W.3d at 108. We overrule Arial's sole issue on appeal.

## Conclusion

We affirm the trial court's decree of termination.

Richard Hightower
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.

19